## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

FREDERICK N.,[1]

     Plaintiff,

v.                                                    Case No. 3:24-cv-1838-NJR

FRANK J. BISIGNANO,[2]
Commissioner of Social Security,

     Defendant.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Frederick N. ("Plaintiff") appeals to the district court from a final decision of the Commissioner of Social Security denying his application for Supplemental Security Income ("SSI"). For the following reasons, the Commissioner's decision is affirmed.

### PROCEDURAL HISTORY

Plaintiff applied for SSI on February 11, 2022, alleging disability beginning May 3, 2021. (Tr. 65). The application was initially denied on July 28, 2022, *id.* at 69–70, and was denied upon reconsideration on December 27, 2022, *id.* at 79. Plaintiff timely requested a hearing, and a hearing was held before Administrative Law Judge (ALJ) Kevin R. Martin on August 3, 2023. *Id.* at 36–54. On September 25, 2023, the ALJ issued an unfavorable decision. *Id.* at 14–35. The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. *Id.* at 1–3.

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] Frank J. Bisignano is the current Commissioner of Social Security. *See* FED. R. CIV. P. 25(d); 42 U.S.C. § 405(g).

Plaintiff now appeals the denial of SSI directly to this Court and raises three issues: whether the ALJ erred in his evaluation of Plaintiff's mental Residual Functional Capacity (RFC), his evaluation of Plaintiff's physical RFC, or his evaluation of the consistency of Plaintiff's symptoms with the evidence in the record. (Doc. 13). The Commissioner timely filed a brief in opposition. (Doc. 19).

## STANDARD OF REVIEW

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Id.* The Supreme Court defines substantial evidence as "more than a mere scintilla, and mean[ing] only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

"An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021)). The reviewing court may not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination so long as substantial evidence supports it." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021)). Where an ALJ ignores a whole line of evidence contrary to the ruling, however, a district court cannot assess whether the ruling rested on substantial evidence and must remand to the agency. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).

Even when the ALJ commits error, a remand is not necessary if the error is harmless. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (citing *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)). Where the Court "look[s] at the evidence in the record" and can "predict with great confidence" that a remand to the ALJ would generate the same result, the error is deemed harmless. *Id.* In that situation, a remand "would be a waste of time and resources for both the Commissioner and the [Plaintiff]." *Id.*

### DISABILITY UNDER THE SOCIAL SECURITY ACT

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). "A claimant need not be disabled at the date of his hearing; rather, he qualifies for benefits if a disability existed for any consecutive twelve-month period during the relevant time frame." *Mara S. on behalf of C.S. v. Kijakazi*, No. 19-CV-8015, 2022 WL 4329033, at *8 (N.D. Ill. Sept. 19, 2022) (citing 20 C.F.R. § 404.320(b)(3)).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities demonstrated by accepted diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth five questions for the ALJ to consider in

assessing whether a claimant is disabled: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment or combination of impairments? (3) Does the impairment meet or equal any impairment enumerated in the regulations as being so severe as to preclude substantial gainful activity? (4) Does the claimant's RFC leave him unable to perform his past relevant work? and (5) Is the claimant unable to perform any other work existing in significant numbers in the national economy? *See* 20 C.F.R. § 404.1520; *Kuhn v. Kijakazi*, No. 22-1389, 2022 WL 17546947, at *2 (7th Cir. Dec. 9, 2022).

An affirmative answer at either Step Three or Step Five leads to a finding that the claimant is disabled. A negative answer at any step, other than at Step Three, precludes a finding of disability. The claimant bears the burden of proof at Steps One through Four. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

### EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is limited to the points raised by Plaintiff.

## I.    Relevant Medical Records

Plaintiff received treatment for anxiety, depression, and substance abuse during the period from June 2018 through June 2023. (Tr. 278–331, 338–496, 616–705, 953–1018). Over the course of this treatment, the description of Plaintiff's symptoms in the provider

notes varied. Sometimes he is described as having normal capabilities and function, sometimes as being impaired in one or more areas. *Compare, e.g., id.* at 315 (Plaintiff had "very mild functional impairment" with health practices like attending appointments or taking medication as prescribed), *and id.* at 343 (Plaintiff's problems pose no problems to his decision making, job functioning, or basic activities of daily living), *and id.* at 349–50 (Plaintiff's judgment and memory are "within normal limits," not impaired), *with id.* at 315 (Plaintiff has "moderate functional impairments" with managing time and money), *and id.* at 371–72, 408 (Plaintiff's judgment and memory are "impaired" rather than "within normal limits").[3]

Plaintiff also received treatment related to his diabetes, *id.* at 511–615, 738–902, 1019–229, including appointments with a podiatrist, *id.* at 1044–50. The onset of his diabetes, which occurred after a ketoacidosis attack and ruptured appendix, was April 26, 2021. *Id.* at 1193. Following surgery for the ruptured appendix, Plaintiff was referred to a physical therapist for weakness and limited mobility on April 29, 2021. *Id.* The physical therapist observed that his gait at the time was shuffling, unsteady, and slow, involving very short steps and a risk of falling. *Id.* at 1195. The physical therapy continued until he was discharged on May 3, 2021. *See id.* at 1196.

On May 13, 2021, and July 26, 2021, Plaintiff's endocrinologist conducted foot

---

[3] Some medical records originating outside of the context of mental health treatment also opine on Plaintiff's mental functionality or impairment. (*See, e.g.*, Tr. 746). There is also conflicting information in these records. *Compare, e.g., id.* (Plaintiff exhibits no memory loss and presents with "normal" judgment and attention span and concentration), *and id.* at 754 (same), *and id.* at 918 (Plaintiff's memory and concentration are "normal"), *with id.* at 533 ("[Plaintiff] presents for intermittent confusion. . . . He believes this could have been caused by blood sugar. . . . He reports this is not the first episode of intermittent confusion since his diagnosis of diabetes and . . . he also often forgets where he is or what he is doing. . . . [Plaintiff] advised to not operate Motor vehicle until further workup by neurology for confusion.").

examinations and found no abnormalities. *Id.* at 1176–77. On March 10, 2022, he reported to his primary care provider that he was experiencing a new burning sensation across the tops of his feet. *Id.* at 520–22. She conducted a foot exam, determined he had thickened toenails, decreased sensation on his soles, and callus formation on his heels. *Id.* On May 4, 2022, Plaintiff was seen by his endocrinologist, who reported that his nails were of normal thickness and his feet were "without callus or ulcer." *Id.* at 499–501. He reported further tingling or burning in his feet during another primary care provider appointment on September 9, 2022, but did not report any calluses or ulcers, and no foot examination was conducted. *Id.* at 731–34.

On October 18, 2022, the endocrinologist again examined Plaintiff's foot and found no abnormalities. *Id.* at 908–10. On April 3, 2023, Plaintiff's primary care provider referred him to a podiatrist after conducting a foot examination and finding callus formation on his left foot. *Id.* at 923–26. One month later, the podiatrist recorded that Plaintiff states he had a wound on his foot and claimed it had been there for three to four months. *Id.* at 1044. He also reported the burning sensation and asked about getting diabetic shoes. *Id.*

The podiatrist's examination found an ulcer on the left foot with "mild serious drainage" but no "gross purulence"[4] or infection. *Id.* at 1047. It was also found that Plaintiff's gait was "unassisted and non-antalgic," meaning he had no limp,[5] and that his bilateral lower extremity strength was rated 5/5, meaning the podiatrist determined he

---

[4] Purulence means pus. *See Purulence*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/purulence (last visited Oct. 7, 2025).

[5] *See, e.g.*, Nadja Auerbach & Prasanna Tadi, *Antalgic Gait in Adults*, NAT'L LIB. OF MED.: NAT'L CTR. FOR BIOTECHNOLOGY INFO. (July 4, 2023), https://www.ncbi.nlm.nih.gov/books/NBK559243/.

had normal muscle strength in both legs.[6] *Id.* However, a monofilament examination revealed that Plaintiff had diminished sensation in his feet. *Id.*

In addition to the examination, the podiatrist cleaned and dressed the ulcer and reported in his notes that he suspected the ulcer was caused by Plaintiff putting too much pressure on his left foot. *Id.* at 1049. Plaintiff was then prescribed diabetic shoes and inserts, given instruction on proper diabetic foot care and foot checks, and told to check his feet, lotion them, and wear the protective shoes and inserts daily. *Id.* at 1050.

Throughout his treatment history, provider notes record numerous complaints by Plaintiff regarding his mental and physical symptoms. *See, e.g., id.* at 525 ("[Plaintiff] reports he is having difficulty with memory."); *id.* at 522 ("[Plaintiff] does state he is having new onset 'burning sensation' across tops of feet."); *id.* at 939 ("[Plaintiff] states anxiousness is interfering with [his activities of daily life]."). Providers also noted that Plaintiff sometimes failed to attend appointments. *E.g., id.* at 301, 635. This resulted in his discharge from treatment on more than one occasion. *Id.* at 522, 711. Plaintiff at times was noted to have issues with medication compliance, *e.g., id.* at 552, but at other times was noted as not having any such issues, *e.g., id.* at 400.

## II.    Consultative Examiner

On December 6, 2022, Dr. Adrian Feinerman performed a consultative examination of Plaintiff. (Tr. 912–22). He found that Plaintiff "ha[d] a cane, but is able to ambulate 50 feet without an assistive device." *Id.* at 917. Plaintiff's "[s]tanding on heels"

---

[6] *See, e.g.,* Søren O'Neill et al., *Using 4+ to Grade Near-Normal Muscle Strength Does Not Improve Agreement,* CHIROPRACTIC & MANUAL THERAPIES, 2017, at 1–2.

and "[n]eed/use of an assistance device" were rated mild, while "[g]etting on/off exam table," "[t]andem walking," "[s]tanding on toes," "[s]quatting and arising," and "[d]ifficulty arising from a chair" were rated "none."[7] *Id.* Dr. Feinerman stated in his summary that Plaintiff had identified diabetes "as the problem that most interferes with his ability to work," but his findings were that Plaintiff "has a cane, but is able to sit, stand, walk, hear, speak, lift, carry, handle objects, and can handle funds on his own behalf." *Id.* at 918. The examination took thirty minutes. *Id.*

### III.   State Agency Examiners

State Agency medical consultant Dr. Jennifer Western found that there was insufficient evidence to make a determination on Plaintiff's disability claim. (Tr. 65–70). On reconsideration, State Agency medical consultant Dr. James Madison found Plaintiff did have medically determinable physical impairments, but that they were considered non-severe. *Id.* at 71–79. As part of the reconsideration, State Agency psychological consultant Dr. Donna Galassi-Hudspeth found Plaintiff had moderate limitations in the ability to carry out detailed instructions and the ability to maintain attention and concentration for extended periods, though these would not preclude him from carrying out simple and routine tasks, exercising judgment commensurate with such tasks, maintaining work attendance, following a work routine with normal supervision, or performing one-to-two step tasks in settings of low social contact. *Id.* at 77–78.

### IV.   Function Report

As part of his application for SSI, Plaintiff submitted a "function report" on

---

[7] The options were none, mild, moderate, severe, and unable. (Tr. 917).

September 24, 2022. (Tr. 211–22). In the report, Plaintiff explained (1) how his ability to work is limited by his conditions, *id.* at 211; (2) the content of his daily activities, *id.* at 216–219; and (3) which of his abilities he considered to be affected by his conditions, *id.* at 220–21.

In response to the question, "How do your illnesses, injuries, or conditions limit your ability to work," Plaintiff explained that his "body ha[d] been experiencing all kinds of problems" since his ketoacidosis attack. These problems included making it hard to walk or stand on his feet. *Id.* at 211. His depression and mental problems made his situation worse, and he "feel[s] like a[n] accident waiting to happen." *Id.*

Plaintiff then recounted his daily activities. He emphasized how stressed he felt, recounting worries about losing limbs due to the diabetes or fears of accidentally cutting himself while handling sharp objects. *Id.* at 216. He reported being "very concern[ed]" about the neuropathy in his feet, which caused them to burn and go numb. *Id.* at 219. And he stated that his depression and anxiety made it hard for him to go out in public or "be[] just a normal person." *Id.* Aside from those feelings, however, his routine included taking care of his dog, dressing, bathing, shaving, and feeding himself, taking his diabetic medication with the help of an alarm, and preparing his own meals daily. *Id.* at 216–17. On a weekly basis, he would do his own laundry and shop for about an hour at the grocery store (a Dollar General three blocks from his apartment). *Id.* at 217–18. When he would go to the store, he would either walk, take public transportation, or use his daughter's car. *Id.* at 218. He also attended medical appointments at least three times a month. *Id.* at 219.

When asked which of his abilities had been affected by his conditions, Plaintiff checked the boxes for lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, memory, completing tasks, concentration, understanding, following directions, using hands, and getting along with others. *Id.* at 220. In response to the follow-up prompt, which asked Plaintiff to "explain how your illnesses, injuries, or conditions affect each of the items you checked" (providing, by way of example, the suggestions "you can only lift [how many pounds], or you can only walk [how far]"), Plaintiff stated that his ketoacidosis attack "destroyed all [his] senses," almost caused him to blind, and "affected all the above." *Id.*

Plaintiff indicated that he could walk "maybe fifty yards" before needing to stop and rest "until the soreness stops, a couple minutes." *Id.* In response to the question "[f]or how long can you pay attention," Plaintiff stated it had taken him "five minutes to write this answer down, because the TV was on." *Id.* He indicated he doesn't finish what he starts and does not follow instructions well because he loses concentration quickly. *Id.* For spoken instructions specifically, he indicated that how well he follows them "[d]epends on how long the person talks or how long the task is." *Id.* He stated that changes in routine confuse and frustrate him. *Id.* at 221. He also indicated that he uses a cane while walking. *Id.*

## V.    Evidentiary Hearing

Plaintiff appeared virtually[8] and was represented by counsel at the hearing on

---

[8] The hearing transcript states that Plaintiff appeared in person, but during the hearing the ALJ stated they were "conducting the hearing over the online video using Microsoft Teams." (Tr. 38, 40).

August 23, 2023. (Tr. 36–54). Vocational Expert Michael Blankenship also appeared. *Id.* at 38.

Plaintiff testified that, since a ketoacidosis attack had left him in the hospital in April 2021, his body felt weak. *Id.* at 42–43. He testified that he could not stand for more than ten minutes, that he had neuropathy in and recurring diabetic ulcers on his feet, and that he was afraid of having a limb amputated from diabetes. *Id.* at 43. He therefore was "trying to stay off [his] feet as much as [he could]." *Id.* Plaintiff testified that he "[s]ometimes [used] a cane," though he was not using it on the day of the hearing. *Id.* at 42. He explained that the cane hadn't been prescribed—he had asked his primary care provider,[9] but she had denied him the cane. *Id.* Instead, he had gotten his cane from his neighbor. *Id.* Plaintiff also claimed that he had not worked anywhere at all in the last two years. *Id.*

Plaintiff testified that he had anxiety and depression, which caused him to dread confrontations with people or leaving the house. *Id.* at 44. Additionally, when his blood sugar was low, it affected his decision-making and caused him to forget things and get confused. *Id.*

After testifying to his treatment for diabetes, ulcers, and mental health, Plaintiff testified about his typical day. *Id.* at 43–47. Plaintiff stated he mostly sat at home by himself. *Id.* at 46. He explained that he did his own cooking, and that he "also ha[s] dinners that are sent to [him] through [his] Medicaid, like TV dinners." *Id.* He would

---

[9] In the hearing, Plaintiff merely referred to her by name: Kassie Jones. (Tr. 42). According to his treatment records, Kassie Jones was Plaintiff's primary care provider. (*E.g.*, *id* at 517).

receive fourteen such microwavable meals at a time. *Id.* He did his own housework and grocery shopping, but testified that he did not visit any friends, engage in any travel, or have any hobbies. *Id.* at 46–47.

Upon examination by his counsel, Plaintiff explained that he started using the cane to try to keep the pressure off certain sides of his feet to prevent ulcers. *Id.* at 47–48. Plaintiff further testified that the neuropathy in his feet, which he experienced as a burning, was a ten on a one-to-ten scale, and burned "constantly, especially when [he was] trying to sleep." *Id.* at 48. He explained that he elevates his feet and wears socks to relieve the pain, which gets worse when he stands, experiences any pressure on his feet, or walks. *Id.* He testified that he could not do a job that required standing for six to eight hours a day, as it is "something that's triggered [his] anxiety and [his] depression because [he] stand[s] up." *Id.*

### DECISION OF THE ALJ

In reaching his decision, the ALJ considered the entire record. (Tr. 17).

At Step One, the ALJ concluded Plaintiff had not engaged in substantial gainful activity since his application date of February 11, 2022. *Id.* at 19.

At Step Two, the ALJ concluded that Plaintiff had the following severe impairments: diabetes with neuropathy, hypertension, obesity, opioid and benzodiazepine use disorders, anxiety, and depression. *Id.* at 19–20.

At Step Three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any impairment enumerated in the regulations. *Id.* at 20–22.

In coming to this conclusion, the ALJ examined the severity of Plaintiff's mental limitations, determining that Plaintiff had moderate limitations in the functional areas of (1) understanding, remembering, or applying information, and (2) concentrating, persisting, or maintaining pace. *Id.* at 20–21. In making these determinations, the ALJ compared Plaintiff's alleged limitations and symptoms to Plaintiff's reported daily activities, his treatment records, and the report of the consultative examiner, Dr. Adrian Feinerman. *Id.*

The ALJ then determined Plaintiff's RFC. *Id.* at 22–29. This involved considering the extent to which Plaintiff's symptoms limited his ability to work and required the ALJ to determine (1) whether Plaintiff had an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the alleged symptoms, and (2) the extent to which the alleged intensity, persistence, or limiting effects of Plaintiff's symptoms were consistent with the evidence in the record. *Id.*

The ALJ first discussed Plaintiff's subjective reports of his symptoms and limitations, which included difficulties:

> lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, with his memory, completing tasks, concentration, understanding, following instructions, using his hands, and getting along with others.

*Id.* at 22. Plaintiff had also "indicated that he was able to walk fifty yards before needing to stop and rest for a couple of minutes," and that he could "care for pets, prepare simple meals, do laundry, care for his personal needs, use public transportation, shop in stores, handle money, and attend appointments." *Id.* The ALJ recounted that, in the hearing, Plaintiff had testified that he "sometimes used a cane," though it was not prescribed and

had been specifically denied by a medical provider. *Id.* at 23. He had also testified that he was unable to stand on his feet for more than ten minutes due to neuropathy and weakness in his body; that he got diabetic ulcers on his feet; that he tried to stay off his feet; that he had just started medicine for the pain in his feet and toes, which was made worse by standing or pressure on his feet; and that he would not be able to stand for six hours to do a job. *Id.* The ALJ also explained that Plaintiff had testified about his anxiety and depression as well as his daily routine. *Id.*

The ALJ then explained that, though his medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's allegations concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical and other evidence in the record. *Id.* at 23–25. In so concluding, he examined first the history of Plaintiff's treatment records for diabetes, which included off-and-on ulceration, off-and-on callus formation, and off-and-on thickening of toenails, as well as consistent reports of a tingling or burning sensation in his feet. *Id.* at 24–25. The ALJ also noted that, according to his treatment notes, Plaintiff had reported being employed in April 2023, *id.* at 24, which contradicted his hearing testimony that he had not worked in two years, *id.* at 23. In addition to Plaintiff's treatment history, the ALJ also considered his activities of daily living to determine that the alleged severity of Plaintiff's symptoms was not consistent with the evidence in the record. He therefore concluded that Plaintiff's diabetes with neuropathy, hypertension, and obesity justified an RFC limitation to work at the medium exertional level. *Id.* at 25.

After discussing Plaintiff's physical RFC, the ALJ recounted Plaintiff's mental

health treatment history to explain why "the record only partially support[ed] [Plaintiff's]
allegations." *Id.* at 25–28. He concluded that the treatment history justified a limitation to
simple, unskilled work, finding that Plaintiff was "able to understand, remember, and
carry out instructions for simple, routine tasks on a sustained basis," but that "his
activities of daily living, while not dispositive he can work, [were] not consistent with the
limitations he alleged." *Id.* at 28. To support this conclusion, he cited to Plaintiff's function
report and explained that Plaintiff was "able to care for his personal needs, shop in stores,
handle money, care for pets, do light household chores, and attend appointments;" he
additionally stated that Plaintiff's history of "limited and conservative treatment [did]
not support greater limitations" in Plaintiff's RFC. *Id.*

The ALJ then considered the medical opinions in the record: the opinion of State
Agency medical consultant Dr. James Madison and State Agency psychological
consultant Dr. Donna Galassi-Hudspeth, and the exam findings of the consultative
examiner, Dr. Adrian Feinerman.[10] *Id.* at 28–29.

The ALJ found that the opinion of Dr. Madison—that Plaintiff had physical
medically determinable impairments, but that they were non-severe—was "not
consistent with or supported by the objective exam findings, treatment notes, or
[Plaintiff's] subjective reports" and therefore unpersuasive. *Id.* at 28. Thus, unlike
Dr. Madison, who had recommended that Plaintiff's RFC permit heavy or very heavy
work, *id.* at 78–79, the ALJ determined that the objective exam findings, treatment notes,

---

[10]  The opinion of State Agency medical consultant Dr. Jennifer Western concluded that there was
insufficient evidence to make a determination on Plaintiff's disability claim. (Tr. 28). The opinion of
Dr. Madison is the subsequent reconsideration of Plaintiff's claim. *Id.*

and Plaintiff's subjective reports better supported an RFC limitation to medium work, *id.* at 28.

The ALJ then recounted Dr. Feinerman's conclusion: that Plaintiff "had a cane but was able to sit, stand, walk, hear, speak, lift, carry, and handle objects." *Id.* This conclusion, which the ALJ described as an "overly broad, vague statement that fails to provide a function-by-function analysis . . . based on [a] limited, one-time exam," was determined to lack probative value. *Id.* As to whether Plaintiff's cane was a "medical necessity," the ALJ determined there was "a lack of objective support, including abnormal exam findings" in the record. *Id.*

The ALJ found more persuasive the opinion of Dr. Galassi-Hudspeth on Plaintiff's mental RFC. He found her conclusion—that Plaintiff "was able to maintain concentration and persistence to carry out simple and routine tasks"—persuasive and agreed that a limitation in Plaintiff's RFC to simple, unskilled work was warranted. *Id.* at 28–29. However, the ALJ found her proposed limitation to one-to-two step tasks to be inadequately explained and supported. *Id.* at 29. He also determined that her proposed social limitations for Plaintiff were unsupported by "the mental status exam findings, treatment notes, or [Plaintiff's] subjective reports." *Id.* Thus, her conclusions were only "partially persuasive." *Id.*

Having reviewed the hearing testimony, function report, treatment records, and medical opinions, the ALJ concluded that Plaintiff did have physical and mental impairments that limited his ability to work, though not to the degree Plaintiff alleged. *Id.* The ALJ's ultimate RFC determination was that Plaintiff could perform medium work

and could understand, remember, and carry out instructions for simple, routine tasks on a sustained basis, with the modification that Plaintiff needs to avoid concentrated exposure to hazards such as unprotected heights. *Id.* at 22.

Because Plaintiff had no past relevant work, the analysis proceeded past Step Four to Step Five. *Id.* at 29. The ALJ relied on the hearing testimony of the Vocational Expert to identify three occupations that a hypothetical individual with Plaintiff's age, education, work experience, and RFC could perform: hospital cleaner (34,700 positions in the national economy), hand packager (82,000 positions in the national economy), and laundry worker (7,600 positions in the national economy). *Id.* at 29–30. Each of these jobs had a medium level of exertion and were considered unskilled. *Id.* at 30. Consequently, the ALJ found that Plaintiff was capable of adjusting to "other work that exists in significant numbers in the national economy" and determined he was not disabled under the Social Security Act. *Id.*

## DISCUSSION

On appeal to this Court, Plaintiff challenges only the ALJ's determination of his RFC. He specifically argues that the RFC determination was flawed with respect to three topics: (1) its evaluation of Plaintiff's mental RFC; (2) its evaluation of Plaintiff's physical RFC; and (3) its evaluation of Plaintiff's symptoms.[11] According to Plaintiff, the ALJ committed a constellation of factual and legal errors when considering each subject. For the reasons explained below, the Court finds that the ALJ did not commit reversible error.

---

[11] In this Court's analysis below, the second and third subjects are consolidated.

I.    **The ALJ's Evaluation of Plaintiff's Mental Impairments Is Supported by Substantial Evidence**

Plaintiff first argues that the ALJ erred by failing to include a "one-to-two steps" limitation in his RFC. He bases this objection on several points: (1) that the ALJ failed to consider and properly weigh State Agency psychological consultant Dr. Galassi-Hudspeth opinion that Plaintiff was capable of one-to-two step tasks (Doc. 13, at 6–7); (2) that the ALJ failed to provide "sufficient detail" in discussing Dr. Galassi-Hudspeth's opinion "for the Court to follow the path" of the ALJ's reasoning, *id.*; (3) that the ALJ, after concluding that Dr. Galassi-Hudspeth's opinion was inadequately supported and explained, should have explicated what an adequate explanation consists of,[12] *id.* at 7; (4) that the ALJ violated 20 C.F.R. § 416.920c(c)(2) by failing to conduct a consistency analysis of Dr. Galassi-Hudspeth's opinion against the evidence in the record of Plaintiff's difficulty "carrying out tasks in excess of 1-2 steps" (Doc. 13, at 7–9); (5) that by disregarding Dr. Galassi-Hudspeth's opinion, the ALJ impermissibly substituted his lay judgment for medical testimony, *id.* at 9; and (6) that the error wasn't harmless because a one-to-two step limitation is not necessarily coterminous with a "simple, routine task" limitation, *id.* at 9–10.

The Commissioner, on the other hand, responds that the ALJ's treatment of Dr. Galassi-Hudspeth's opinion limiting Plaintiff to one-to-two step tasks was sufficient. (Doc. 19, at 2). By explaining that the State Agency psychological consultant's conclusion

---

[12] Plaintiff points to no authority for the proposition that this is a requirement imposed on ALJs, presumably because there is no such requirement. *See, e.g., Warnell v. O'Malley*, 97 F.4th 1050, 1053–54 (7th Cir. 2024) (explaining the articulation requirements imposed on social-security adjudicators). Consequently, the Court finds this was not error without further discussion.

was "not adequately explained or supported" (Tr. 29), the ALJ showed his consideration of the medical source and explained all he needed to. (Doc. 19, at 2). Moreover, the Commissioner explains that, with respect to a consistency analysis, the law does not require the ALJ to discuss the consistency of every opinion from each medical source independently; instead, 20 C.F.R. § 416.920(b)(1) permits the consolidation of all medical opinions or prior administrative medical findings from one medical source into a single analysis. (Doc. 19, at 3). When the ALJ discussed the inconsistency of Dr. Galassi-Hudspeth's opinion of Plaintiff's social limitations with the mental status examinations, treatment notes, or Plaintiff's subjective reports, the ALJ satisfied that legal requirement. *Id.* Finally, the Commissioner points out that sometimes a limitation for simple, routine tasks is sufficient to accommodate a State Agency psychological expert's recommendation for one-to-two step tasks, meaning remand would not be justified even if Plaintiff is correct. *Id.*

The Commissioner is correct that Plaintiff is seeking to impose a greater burden on the ALJ than required, as "[a]n ALJ need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning" to satisfy the articulation requirement. *Warnell v. O'Malley*, 97 F.4th 1050, 1053–54 (7th Cir. 2024) ("Time and time again, we have emphasized that social-security adjudicators are subject to only the most minimal of articulation requirements.") The ALJ's eight-page discussion of Plaintiff's RFC easily clears this hurdle. (Tr. 22–29). That the ALJ, in accepting some recommended limitations and explaining the inconsistency of others, does not provide a treatise on why the one-

to-two step limitation recommended by Dr. Galassi-Hudspeth is inadequately explained
or supported is not a violation of 20 C.F.R. § 416.920c(c)(2); indeed, the Court agrees with
the Commissioner that 20 C.F.R § 416.920c(b)(1) clearly states that not every finding from
every medical source need be discussed in detail. *Accord Warnell*, 97 F.4th at 1053.

Moreover, the ALJ did not commit any other legal errors. The ALJ did not
"substitute[] his judgment for that of Dr. Galassi-Hudspeth" when making the RFC
determination. (Doc. 13, at 9). An ALJ impermissibly "play[s] doctor" by "mak[ing] an
independent medical finding regarding whether particular activities are inconsistent
with a medical diagnosis." *Michael L. v. Comm'r of Soc. Sec.*, 23-cv-00064, 2024 WL 4225537,
at *6 (S.D. Ill. Sept. 18, 2024). Here, the ALJ merely found that the State Agency
psychological consultant's suggested RFC limitation was unsupported by the record and
inadequately explained. (Tr. 29). This is well within the remit of the ALJ—if it were not,
the ALJ would be bound by any and every medical opinion concerning a claimant's RFC,
which simply is not how the law works. *E.g.*, *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir.
2014) ("[T]he determination of a claimant's RFC is a matter for the ALJ alone—not a
treating or examining doctor—to decide.").

The Court also finds that substantial evidence supports the ALJ's determination
that a limitation in Plaintiff's RFC to simple, routine tasks was appropriate. When
considering Plaintiff's mental impairments, the ALJ examined both medical reports and
Plaintiff's own reports before concluding that Plaintiff had moderate limitations in
following instructions and completing tasks. (*See* Tr. 20–21). Though Plaintiff claimed
greater limitations than those incorporated in the RFC, the ALJ compared Plaintiff's

account of his own daily activities—caring for his personal needs, shopping in stores, handling money, caring for pets, doing light household chores, and attending appointments—with the limitations alleged. *Id.* at 28. Because the limitations alleged were inconsistent with those daily activities, the ALJ reasonably concluded that the RFC did not need to include all the limitations alleged by Plaintiff.

However, even if the ALJ's rejection of a one-to-two step limitation was legally erroneous or not supported by the substantial evidence, the error would be harmless. This is because the Court can conclude "with great confidence" that the ALJ would reach the same decision on remand. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).

Plaintiff argues that a one-to-two step limitation in the RFC means that, during the analysis at Step Five, the ALJ should only have considered Level One Reasoning jobs, whereas simple, routine work includes jobs with a Reasoning Level of two. (Doc. 13, at 9–10). Each job identified by the ALJ at Step Five had a Reasoning Level of two. *Id.* Therefore, Plaintiff claims, the ALJ's decision would be different on remand.

The record belies Plaintiff's argument. During the hearing, Plaintiff's counsel posed questions to the Vocational Expert about jobs suitable for persons with even greater limitations than those the ALJ eventually included in the RFC. (Tr. 51–53). When asked about a job that would be available to someone who, in addition to all the limitations identified in the RFC, would need additional limitations for time spent standing or walking, the Vocational Expert identified the position of a "power screwdriver operator," for which there are 495,700 jobs at the national level. *Id.* at 52. This position has a Reasoning Level of one. 2 U.S. DEP'T OF LABOR, DICTIONARY OF

OCCUPATIONAL TITLES 681 (4th ed. 1991). And, according to the testimony of the Vocational Expert, there are more jobs for this position than for the three identified in the ALJ's determination. (*Compare* Tr. 52, *with* Tr. 30).

Consequently, even if there had been a one-to-two step limitation in the RFC, the ALJ still would have found that Plaintiff would be capable of making a successful adjustment to other work that exists in significant numbers in the national economy. *Cf. Weaver v. Berryhill*, 746 F. App'x 574, 578 (7th Cir. 2018) (though ALJ erred by not considering E.R. doctor's opinion, error was harmless as "[e]ven if the ALJ had imposed the E.R. doctor's recommended restrictions," Weaver still could have returned to her previous work). As a result, any error with respect to including that limitation was harmless.

Plaintiff next argues that the ALJ erred by concluding that Plaintiff was moderately limited in concentrating, persisting, or maintaining pace without including any related limitations in the RFC. (Doc. 13, at 10). This is an incorrect reading of the ALJ's decision. Although the ALJ acknowledges at Step Two that Plaintiff has a moderate limitation with concentration, persistence, and pace (Tr. 21), in his RFC determination he explicitly credits the State Agency psychological consultant's conclusion that "[t]he medical evidence indicates that [Plaintiff] can maintain concentration and persistence to carry out simple and routine tasks." *Id.* at 28–29, 78. The ALJ permissibly relied on the medical evidence to conclude that, to the extent that Plaintiff does face limitations in concentration, persistence, and pace, he is still capable of "maintaining work attendance and follow[ing] a work routine with normal supervision." *Id.* at 78. The ALJ therefore

addressed the limitation sufficiently in the RFC by limiting Plaintiff to "simple, routine tasks on a sustained basis."[13]  *Id.* at 28.

Thus, the question is whether substantial evidence supports the ALJ's determination, and the Court concludes that it does. The ALJ provided a clear logical bridge from the evidence to his conclusion that Plaintiff's limitations in concentration, persistence, and pace were adequately addressed by a limitation to simple, routine work in the RFC. The ALJ compared Plaintiff's alleged limitations to the medical evidence in the record (such as treatment notes describing his concentration and attention span as normal) and Plaintiff's own accounts of his daily activities (such as preparing simple meals, doing laundry, handling money, and watching TV). *Id.* at 21 (citing Tr. 211–22, 746, 764, 918, 1025). He found the limitations Plaintiff alleged to be inconsistent with what the evidence demonstrated (as did the State Agency psychological consultant). *Id.* at 25–28, 77. And the ALJ relied on the State Agency psychological consultant's conclusion that Plaintiff's limitations are not so severe as to preclude him maintaining concentration and persistence to carry out simple and routine tasks in a work setting. *Id.* at 28–29. Taken together, this constitutes substantial evidence supporting the ALJ's determination.

---

[13] Plaintiff points to *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618–20 (7th Cir. 2010), and *Yurt v. Colvin*, 758 F.3d 850, 857–59 (7th Cir. 2014), for the proposition that a simple, routine work limitation cannot address moderate limitations in concentration, persistence, or pace. These cases, however, involve challenges to the language used by ALJs in posing hypotheticals to the Vocational Experts at Step Five; specifically, in both cases, the ALJ included a limitation on concentration, persistence, or pace in the RFC but then neglected to include any such limitations in the hypotheticals posed to the Vocational Expert. *O'Connor-Spinner*, 627 F.3d at 618–20; *Yurt*, 758 F.3d at 857–59. By contrast, Plaintiff is challenging not Step Five but the RFC determination; he argues that the RFC should have included an additional limitation, not that the limitations it contained were not reflected at Step Five. This distinction has significance: here, if substantial evidence supports the ALJ's determination that, despite any limitation in concentration, persistence, or pace, Plaintiff is capable of sustaining concentration to carry out simple and routine tasks, then the limitation to simple and routine tasks in the RFC was not error.

Plaintiff argues, however, that "the record reflects that [he] had difficulty maintaining his attention and concentration." (Doc. 13, at 11). To support this claim, Plaintiff cites to three types of evidence: (1) medical records that support the orthogonal claim that Plaintiff suffered from anxiety [14] (Tr. 45, 441, 976–77, 1090); (2) his own accounts of his difficulties concentrating or completing tasks, *id.* at 220–21; and (3) evidence of his difficulty in attending scheduled medical appointments or taking medication, *id.* at 217, 301–03, 518, 552, 634, 664–65, 681, 683, 710, 733, which he claims corroborates his difficulty in completing tasks. (Doc. 13, at 11). But the standard of review is not whether there exists *any* evidence in the record that supports a conclusion contrary to the ALJ's; it is whether substantial evidence supports the ALJ's conclusion. None of the evidence to which Plaintiff points is so conclusive that it was unreasonable for the ALJ to rely on the medical sources and opinions to the contrary. As a result, the ALJ did not err in making the determination that the RFC did not require any additional concentration, persistence, or pace limitations.

## II.    The ALJ's Evaluation of Plaintiff's Physical Impairments Is Supported by Substantial Evidence

Plaintiff also takes issue with the ALJ's analysis of the physical component of his RFC. First, he argues that the ALJ's conclusion that he was capable of "medium work"[15]

---

[14] Plaintiff also cites to an Office Treatment Record from November 11, 2022 (Tr. 937–40) to support the claim that the medical record demonstrates that his anxiety "interfered with his activities of daily living." (Doc. 13, at 11). Nothing in the treatment notes from that visit indicate any difficulty with concentration, persistence, or pace. And, even if the notes did so indicate, they are merely recounting Plaintiff's complaints to his medical provider, not making an objective observation that Plaintiff's activities of daily living are disrupted by his anxiety. *See Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) ("And medical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints." (citing *Farrell v. Sullivan*, 878 F.2d 985, 989 (7th Cir. 1989))).

[15] Depending on the degree of physical exertion required, a job is classified as sedentary, light, medium, heavy, or very heavy. 20 C.F.R. § 410.967. Medium work is work which "involves lifting no more than

was erroneous for multiple reasons. (Doc. 13, at 12–17). He then offers objections to the

evaluation of his symptoms in the ALJ's determination of Plaintiff's physical RFC. *Id.* at

17–19. Because the evaluation of Plaintiff's symptoms is a necessary step in determining

the ultimate RFC, *see* Social Security Ruling 16-3p Titles II and XVI: Evaluation of

Symptoms in Disability Claims, 82 Fed. Reg. 49462 (Oct. 25, 2017), Plaintiff's arguments

substantially overlap. Consequently, the Court addresses these arguments together.

The physical component of the RFC included a limitation to medium work.

(Tr. 22–29). Plaintiff raises several objections, arguing that (1) the ALJ failed to sufficiently

articulate how the evidence led to the conclusions that Plaintiff was capable of medium

work or that his alleged symptoms were not consistent with the evidence in the record

(Doc. 13, at 12, 15–16, 18–19); (2) the medium work limitation is greater than the

limitations proposed by the medical opinions in the record, meaning the ALJ's conclusion

was impermissibly based on lay speculation, *id.* at 13; (3) the ALJ's logic was internally

inconsistent, *id.* at 17; (4) the record does not support the factual conclusion that Plaintiff

was capable of medium work, *id.* at 13–15, 18; and (5) the ALJ did not specifically address

Plaintiff's claim that he needed to elevate his legs, *id.* at 16–17.

Plaintiff first argues that the ALJ insufficiently articulated his reasoning. (Doc. 13,

---

50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." *Id.* A person
who can do medium work is also capable of doing both sedentary work (which "involves lifting no more
than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small
tools") and light work (which "involves lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds"). *Id.* Light work is contrasted with sedentary work, as light
work can involve either "a good deal of walking or standing" or "sitting most of the time with some
pushing and pulling of arm or leg controls." *Id.* At the evidentiary hearing before the ALJ, the Vocational
Expert testified that work which involves mostly sitting is nevertheless sometimes classified as light or
medium due to the amount of weight manipulated. (Tr. 51–52).

at 12–13, 18–19). Specifically, he argues the ALJ did not explain how he arrived at the
medium work conclusion or how it was consistent with the medical evidence, *id.* at 12,
15–16, or why Plaintiff's daily activities and treatment levels were inconsistent with
Plaintiff's alleged symptoms, *id.* at 18–19.

The Court disagrees. "All we require is that ALJs provide an explanation for how
the evidence leads to their conclusions that is 'sufficient to allow us, as a reviewing court,
to assess the validity of the agency's ultimate findings and afford [the plaintiff]
meaningful judicial review.'" *Warnell*, 97 F.4th at 1054 (quoting *Moore v. Colvin*, 743 F.3d
1118, 1121 (7th Cir. 2014)). The ALJ "need not address every piece or category of evidence
identified by [Plaintiff], fully summarize the record, or cite support for every proposition
or chain of reasoning." *Id.* at 1053 (citing *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir.
2005)). Here, the ALJ satisfied this requirement.

In determining that Plaintiff was capable of medium work, the ALJ thoroughly
summarized his alleged symptoms and treatment history (Tr. 22–24). Citing repeatedly
to evidence in the record, the ALJ then explained why "[t]he objective medical evidence
and the [Plaintiff's] treatment records are not consistent with the degree of subjective
limitations alleged." *Id.* at 24–25. Then the ALJ explained which of Plaintiff's daily
activities are inconsistent with the alleged severity of his symptoms, with a citation to
Plaintiff's own account of those activities. *Id.* at 25 (citing Tr. 211–22)). Finally, he
explained that, though the medical opinion of the State Agency medical consultant had
concluded that Plaintiff's medically determinable impairments were non-severe and that
he was capable of heavy or very heavy work, *id.* at 78–79, this conclusion was "not

consistent with or supported by *the objective exam findings, treatment notes, or the claimant's subjective reports*" *id.* at 28 (emphasis added).

In sum, the ALJ articulated that, while the evidence does not indicate that Plaintiff is as limited as he claims to be, the evidence contradicts any conclusion that Plaintiff has no severe physical limitations—and that "the exams and objective findings better support limiting" Plaintiff to medium work. *Id.* This is more than sufficient articulation to permit a reviewing court to follow the ALJ's logical bridge from the evidence to his conclusions.[16] Thus, both the ultimate RFC finding and the symptom evaluation by the ALJ met the articulation requirements.

Plaintiff's second argument also takes issue with the ALJ's decision to differ from the conclusion of the State Agency medical consultant. (Doc. 13, at 13). The State Agency medical consultant's opinion concluded that Plaintiff was capable of heavy or very heavy work. (Tr. 78–79). The ALJ found those opinions unpersuasive, however, and concluded that Plaintiff was only capable of medium work. *Id.* at 28. Plaintiff's argument is that, because the medium work conclusion had to come from *somewhere*, it must have come from the ALJ's lay speculation. (Doc. 13, at 13).

Plaintiff is incorrect. The ALJ stated explicitly that the medium work conclusion was supported by "the exams and objective findings" (Tr. 29), which had been detailed

---

[16] Plaintiff also argues that "the ALJ failed to explain the relevance of the level and type of treatment [Plaintiff] received to the consistency of his subjective allegations with the record." (Doc. 13, at 18–19). It is true that, on page 25 of the administrative record, the ALJ states "[m]oreover, [Plaintiff's] limited and conservative treatment does not support greater limitations" without further elaboration. (Tr. 25). This is because the elaboration was contained in the seven paragraphs discussing Plaintiff's treatment history beginning on the previous page. *See id.* at 24–25 (beginning the seven paragraphs with the sentence "[t]he objective medical evidence and the [Plaintiff's] treatment records are not consistent with the degree of subjective limitations alleged").

over multiple pages of the decision. *Id.* at 23–25. As Plaintiff acknowledges (Doc. 13, at 13), there is no requirement that an ALJ rely on a medical opinion to determine the RFC. *Thomas*, 745 F.3d at 808 ("[T]he determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide.").[17] Here, where the ALJ based his determination on the medical evidence in the record, if not the opinion of the State Agency medical consultant, he did not impermissibly play doctor or substitute lay speculation for evidence.

Plaintiff's third argument is similarly unavailing. This argument, which is related to the second, runs as follows:

> [T]he ALJ stated that there was "an objective medical basis" for [Plaintiff's] reports of pain and limitations, but his statements regarding the intensity, persistence, and limiting effects of his symptoms were "not fully consistent with the medical and other evidence in the record." Regarding medical *evidence*, the only medical *opinions* contained in the record were from the State agency physicians and the consultative examiner. . . . Yet, the ALJ found these medical opinions to be unpersuasive. It was internally inconsistent for the ALJ to find [Plaintiff's] allegations inconsistent with the medical opinions when he also disagreed with these medical opinions.

(Doc. 13, at 17 (emphasis added) (quoting Tr. 24) (first citing Tr. 67, 74; then citing Tr. 28; then citing *Lothridge*, 984 F.3d at 1234; and then citing *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010))). This argument relies on the mistaken premise that the medical *opinions*

---

[17] Plaintiff attempts to rely on *Garcia v. Colvin*, 741 F.3d 758, 762 (7th Cir. 2013), and *Mandrell v. Kijakazi*, 25 F.4th 514 (7th Cir. 2022), for the proposition that where no medical records indicate the specific RFC determined by the ALJ, there is error. *Garcia*, however, dealt with a case where the record contained two medical opinions—each "opining that Garcia [couldn't] work full time and basing their opinions on extensive medical records and their own medical exams"—and "*no contrary evidence.*" *Id.* at 761 (emphasis added). Here, the medical opinions in the record all concluded that Plaintiff was *less* impaired than the ALJ ultimately determined; *Garcia*, thus, is not on point. *Mandrell* is similarly inapposite, dealing again with a situation where the medical opinions and evidence in the record indicated that the plaintiff was *more* impaired than the ALJ ultimately concluded. *Mandrell*, 25 F.4th at 516–17.

by the State Agency medical consultants and by the consultative examiner are the only medical *evidence* in the record. On the contrary: the medical evidence in the record includes the voluminous treatment notes by Plaintiff's many healthcare providers. (Tr. 265–1229). The supposed internal inconsistency identified by Plaintiff simply does not exist.

In Plaintiff's fourth argument, he challenges the factual support for the ALJ's physical RFC determination. (Doc. 13, at 13–16, 18). As above, when reviewing a challenge to an ALJ's factual findings, the Court is limited to assessing whether substantial evidence supports those findings. The Court must not "'reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination.' Rather, this [C]ourt asks whether the ALJ's decision 'reflects an adequate logical bridge from the evidence to the conclusions.'" *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (quoting *Gedatus*, 994 F.3d at 900).

Here, the logical bridge is apparent. The ALJ saw that no medical opinions in the record had determined that Plaintiff was physically unable to work. In fact, the only medical opinion to expressly consider the exertional requirement had concluded that Plaintiff was capable of heavy or very heavy work. (Tr. 78–79). The conclusion from other medical opinion, that of Dr. Feinerman, was insufficiently specific for the ALJ to determine Plaintiff's exertional capability. *See id.* at 28, 912–22. However, the ALJ thought that these results were not consistent with the "objective exam findings, treatment notes, or [Plaintiff's subjective reports]," which indicate a greater degree of limitation than heavy or very heavy, but no more than a limitation to medium work. *Id.* at 28. Given that

Plaintiff's treatment history contained evidence of off-and-on ulceration and callus formation on Plaintiff's feet, *see id.* at 24–25; the ability to walk at least some distance without a limp or assistance, *id.* at 917–18, 1047; and normal strength in both legs, *id.* at 1047, this Court cannot say the ALJ's determination has no evidentiary support in the record.

To contest the ALJ's conclusion, Plaintiff relies primarily on his own statements (either at the hearing, in his function report, or to his healthcare providers, as recorded in their treatment notes). (Doc. 13, at 13–15, 18). He points to his claims that he could not stand for more than ten minutes due to his neuropathy, which standing or walking made worse, *id.* at 13–14 (citing Tr. 48); that the "agitation of his shoes 'drilling' into his feet caused him to develop diabetic ulcers," *id.* at 14 (quoting Tr. 45); and that he had difficulty standing and walking, *id.* (citing Tr. 211, 220). In addition to his own testimony, Plaintiff points to medical records "detail[ing] the difficulties [Plaintiff] had with his feet," including decreased sensation, calluses, thickened toenails; the observations of Dr. Feinerman that Plaintiff had had mild difficulty standing on his heels and was observed to use his cane to decrease the pressure on his right foot; and the notes from his post-appendectomy physical therapy indicating that his gait at the time was shuffling and slow *Id.* (citing Tr. 47, 522, 733, 914, 917, 924, 1047, 1195).

Plaintiff's arguments pointing to record evidence contradicting the ALJ's assessment of the severity of his physical impairment fall far short of undermining the ALJ's conclusions. The ALJ summarized Plaintiff's statements about his own condition (*See* Tr. 22–23) and his relevant treatment history, *id.* at 23–25. The ALJ weighed the

evidence and reasonably concluded that, taken together, it suggested some degree of physical impairment, but no more than to the medium exertional level. This Court cannot reweigh the evidence considered by the ALJ, nor can it determine that the evidence before the ALJ better supports a factual conclusion that Plaintiff was only capable of, for example, sedentary work. Because "[a]t the very least, the evidence of record would allow reasonable minds to differ as to the severity of [Plaintiff's] impairment," deference to the ALJ's conclusion is required. *Schmidt*, 395 F.3d at 745 (citing *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).

Plaintiff also argues that substantial evidence does not support the medium work limitation because the ALJ ignored Plaintiff's need for a cane. (Doc. 13, at 14–15). Plaintiff's argument has three steps: first, Plaintiff testified that he needed a cane, *id.* at 14 (citing Tr. 47); second, the ALJ erred in dismissing the cane as medically unnecessary because a cane does not require a prescription and the medical evidence stating that Plaintiff could walk without a cane only tested his ability to walk 50 feet, *id.* at 14–15 (first citing *Parker*, 597 F.3d at 922; and then citing Tr. 917); third, use of a cane would preclude the performance of medium work, *id.* at 15.

However, the ALJ's decision that there was a lack of objective support for the medical necessity of a cane (Tr. 28) is also supported by substantial evidence. There is nothing in any of Plaintiff's treatment notes indicating that any medical provider ever found that Plaintiff should use a cane. *See id.* at 265–1229. The State Agency medical consultant's medical opinion merely recites the opinion of Dr. Feinerman [18] as to

---

[18] Plaintiff characterizes Dr. Feinerman's medical opinion as "stat[ing] there was support for [Plaintiff's]

Plaintiff's cane, *id.* at 73–74, and all other medical evidence in the record either does not support the conclusion that a cane is necessary or actively contradicts it.[19] The only evidence in favor of the necessity of a cane, then, is Plaintiff's own testimony, which the ALJ plainly thought was insufficient to overcome the lack of medical evidence. *See id.* at 28.

It is not this Court's job to reweigh the evidence before the ALJ but to determine whether the ALJ has constructed a logical bridge between the evidence and his conclusions. Again, where an ALJ's conclusion is supported by evidence in the record that "would allow reasonable minds to differ as to the severity of [Plaintiff's] impairment," deference to the ALJ's determination is required. *Schmidt*, 395 F.3d at 745 (citing *Walker*, 834 F.2d at 640).

Finally, Plaintiff's fifth argument is that the ALJ failed to address his allegation that "he needed to elevate his legs to address diabetic neuropathy," which "constituted a failure by the ALJ to weigh the evidence." (Doc. 13, at 16). Though Plaintiff acknowledges an ALJ need not address each piece of evidence in the record, he argues that the ALJ must not "ignore 'entire swaths'" of evidence in the record. *Id.* (quoting *Reinaas v. Saul*, 953 F.3d

---

use of a cane." (Doc. 13, at 14–15 (citing Tr. 917)). However, this does not appear to be true: the closest the opinion comes is a table which lists as "[m]ild" Plaintiff's "[n]eed/*use* of assistance device." (Tr. 917 (emphasis added)). It is not immediately apparent whether Dr. Feinerman assessed Plaintiff as having a mild need for a cane or a mild use of a cane, but it is worth noting that each other mention of the cane in Dr. Feinerman's report speaks only to the fact that Plaintiff *had* a cane, not that it was a medical necessity. *See id.* at 913 ("He has a cane to decrease the weight on his right foot. The cane was not prescribed."); *id.* at 917 ("This claimant has a cane, but is able to ambulate 50 feet without an assistive device."); *id.* at 918 (stating in summary that Plaintiff "has a cane, but is able to sit, stand, walk, hear, speak, lift, carry, [and] handle objects"). Far from expressing "support for [Plaintiff's] use of a cane," (Doc. 13, at 15) Dr. Feinerman's report appears inconclusive at best.

[19] In Plaintiff's hearing testimony, he was asked who prescribed his cane. (Tr. 42). He stated that he "tried to get a cane from [K]assie Jones," his primary care provider, but "[s]he denied [him] a cane." *Id.*

461, 467 (7th Cir. 2020)).

The ALJ's decision does not ignore "entire swaths" of evidence. Plaintiff only points to two statements from his hearing testimony. (Doc. 13, at 15 (citing Tr. 43, 48)). This testimony, in its entirety, was that Plaintiff "elevate[s] his foot" to relieve the burning sensation in his feet from neuropathy (Tr. 48) and that, because he is "really scared" of losing a limb to diabetes, he is "trying to stay off [his] feet as much as [he] can, and [he] [has] to elevate his legs," *id.* at 43. The ALJ acknowledged these statements in his summary of the hearing testimony. *Id.* at 23. The question, therefore, is not whether the ALJ impermissibly ignored entire swaths of evidence. The question is merely whether the decision not to include a leg elevation limitation in Plaintiff's RFC is supported by substantial evidence.

First, Plaintiff "bears the burden to prove [he] is disabled by producing medical evidence." *Gedatus*, 994 F.3d at 905 (citing *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010)); *see also* 20 C.F.R. § 404.1529 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled."). The ALJ was under no obligation to include a limitation as to leg elevation based solely on Plaintiff's testimony when none of the medical evidence in the record indicated such a limitation was necessary.

Second, none of the cases cited by Plaintiff to support his argument are on point. *See Smith v. Astrue*, 467 F. App'x 507, 510–11 (7th Cir. 2012) (ALJ erred by dismissing the plaintiff's claim she was "medically required to elevate her legs" where the record contained "records from her hospital stay, which included instructions to keep the leg elevated after discharge" and ALJ "did not explain why she disregarded this evidence");

*Chase v. Astrue*, 458 F. App'x 553, 556–57 (7th Cir. 2012) (where the only relevant medical evidence in the record indicated that the plaintiff needed to keep his leg elevated to 90 degrees, ALJ erred "by determining that the degree of foot elevation required . . . was 15 to 20 degrees" without any basis for those numbers); *Bunton v. Saul*, 2021 WL 2036534, at *3–4 (N.D. Ill. May 21, 2021) (where "there was ample evidence in the record that Plaintiff has consistently been instructed to elevate her leg," it was error for ALJ to "exclude[e] a leg elevation requirement" from RFC). Unlike this case, each case Plaintiff identifies concerns an ALJ ignoring medical evidence in the record that indicated the plaintiff needed to elevate his leg. Here, no such evidence exists. Thus, the ALJ did not err by failing to include a leg elevation limitation in Plaintiff's RFC.

Ultimately, there is a fatal flaw undermining each of Plaintiff's objections to the ALJ's determination that the physical RFC should include a medium work limitation: the fact that "there is no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ." *Rice v. Barnhart*, 384 F.3d 363, 370–71 (7th Cir. 2004); *see also Dudley v. Berryhill*, 773 F. App'x 838, 843 (7th Cir. 2019) ("When no doctor's opinion indicates greater limitations than those found by the ALJ, there is no error."). The ALJ, in fact, "assessed more limits than any doctor did," *Gedatus*, 994 F.3d at 904, limiting him to medium work where the State Agency medical consultant concluded that Plaintiff was capable of sustained "heavy/very heavy" work. (Tr. 23–25, 28, 78–79). Because Plaintiff had the burden of proving his disability "by producing medical evidence," *Gedatus*, 994 F.3d at 905, and because the ALJ found greater limitations than any medical opinion indicated, there is no error.

CONCLUSION

For these reasons, the Commissioner's final decision denying Plaintiff's application for social security disability benefits is **AFFIRMED**, and this action is **DISMISSED with prejudice**.

The Clerk of Court is directed to enter judgment in favor of the Commissioner of Social Security.

**IT IS SO ORDERED.**

DATED:   October 10, 2025

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judges**